IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 11, 2004 Session

# WILLIAM (BILL) GRAVES, ET UX. v. JEREMY S. JETER, ET AL.

**A Direct Appeal from the Circuit Court for Hardeman County**
**No. 9377     The Honorable Jon Kerry Blackwood, Judge**

---

**No. W2003-02871-COA-R3-CV - Filed December 21, 2004**

---

This is a personal injury case arising from an automobile accident. Defendant/Appellee was traveling at an excessive rate of speed and attempted to pass Plaintiffs/Appellants' vehicle in a no pass zone as Plaintiffs/Appellants were making a left-hand turn into their driveway. Following a bench trial, the trial court found Plaintiff/Appellant driver 40% at a fault for the accident and Defendant/Appellee 60% at fault. Plaintiffs/Appellants appeal on issues of fault and damages. We affirm as modified herein.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Mimi Phillips and R. H. "Chip" Chockley of Memphis for Appellants, William Graves and Tressie Lavelle Graves

Nicholas E. Bragorgos and Jonathan W. McCrary of Memphis for Appellees, Jeremy Jeter and Hubert Jeter

## OPINION

On November 22, 2000, William Graves was driving his 2001 Dodge truck, with his wife, Tressie Lavelle Graves (together with Mr. Graves, "Plaintiffs," or "Appellants") northbound on Ebenezer Road in Toone, Tennessee. Jeremy Jeter was also proceeding North on Ebenezer Road in a 1996 Chevrolet truck, which was allegedly owned by Hubert Jeter (together with Jeremy Jeter,

"Defendants," or "Appellees").[1] Jeremy Jeter's vehicle was some distance behind Mr. Graves' when Mr. Graves slowed his truck in anticipation of making a left-hand turn into his driveway.[2] As Mr. Graves turned into his driveway, Jeremy Jeter attempted to pass the Graves' vehicle and the front of Jeremy Jeter's truck struck the center left side of the Graves' vehicle. Jeremy Jeter admits that he was speeding at the time he attempted to pass the Graves' vehicle and that he entered a no passing zone immediately prior to his attempted passing. Mr. Graves testified that he checked his rear and side-view mirrors. Mr. Graves also testified that he knew that his truck had a blind spot but that he never checked this spot before making the turn. As a result of the accident, the Graves' vehicle received extensive damage and Mr. Graves was thrown across the interior of the truck, landing unconscious with his head across Mrs. Graves' lap and his knees in the floorboard.

Prior to the accident, in the summer of 2000, Mr. Graves began experiencing neck pain and pain in both arms. On or about November 8, 2000, Mr. Graves had been diagnosed with two ruptured disks in his neck due to degenerative changes. Mr. Graves' neurologist, Dr. Anthony Segal, had scheduled corrective surgery for November 28, 2000. Five days before this surgery, Mr. Graves was involved in the accident with Jeremy Jeter. As a result of this accident, Mr. Graves spent three (3) days in Baptist Hospital. The Graves contend that Mr. Graves' condition was exacerbated by the accident and that Mr. Graves showed symptoms of significant neurological deficits, including weakness in his arms and legs, spastic gait, difficulty urinating, and marked shakiness in the left leg. The scheduled disk repair surgery was performed after a delay of approximately six (6) weeks. At Mr. Graves' last office visit in January of 2002, Dr. Segal believed Mr. Graves to be near maximum medical improvement, and that he would be left with permanent significant neurological deficits.

The Graves were married in April 1997. Mr. Graves had been employed for most of his life in the logging business and had done some carpet laying periodically. In 1998, he and his wife started the B & L Logging Company. The Graves financed certain equipment to carry on this business. Following his surgery, Mr. Graves was not able to return to work and the Graves eventually sold their logging equipment. Mr. Graves has not worked since the accident.

On April 12, 2001, the Graves filed their Complaint for Damages against Jeremy Jeter and his father, Hubert Jeter. On May 16, 2001, Hubert Jeter filed his Answer, denying liability. On June 5, 2001, Blue Cross/Blue Shield of Tennessee filed a Motion to Intervene and an Intervening Complaint to preserve its right of subrogation. An "Order Allowing Intervention" was entered on September 19, 2001. On October 18, 2001, Jeremy Jeter filed his Answer, denying liability. On March 18, 2002, Hubert Jeter filed a Motion to Amend his Answer to assert that the vehicle driven

---

[1] As discussed, *infra*, Hubert Jeter was allowed to amend his original Answer to assert that Jeremy Jeter was the owner of the Chevrolet truck. By its "Order of Judgment," entered October 21, 2003, the trial court dismissed the claim against Hubert Jeter with prejudice.

[2] There is dispute in the record as to whether Mr. Graves slowed to fifteen (15) miles per hour or to five (5) miles per hour. There is also dispute in the record as to whether Mr. Graves turned on his turn signal. However, in its Findings, the trial court found that Mr. Graves did turn on his signal. This particular Finding is not appealed.

by Jeremy Jeter belonged to Jeremy Jeter. The Motion to Amend was granted on June 6, 2002 and the "Amended Answer of Hubert Jeter" was filed on June 7, 2002.

A trial was held before the trial court, sitting without a jury, on September 30, 2003. An "Order of Judgment" (the "Order") was entered on October 21, 2003 and reads, in relevant part, as follows:

> After all the proof had been entered the Court assessed liability against Jeremy Jeter at 60% and against the Plaintiff, William Graves, at 40%. The Court further found that William Graves suffered damages of $30,000.00 and the Plaintiff, Tressie Graves, suffered damages of $2,000.00.
>
> Based upon the Court's finding of liability, the Court hereby enters an Order of Judgment in favor of William Graves in the amount of $18,000.00. The Court hereby enters an Order of Judgment in favor of Tressie Graves in the amount of $1,200.00. The Court further enters an Order Dismissing Hubert Jeter with Prejudice.

The Findings of the trial court, entered on October 3, 2003, read, in pertinent part, as follows:

> Before ruling on the factual disputes to resolve this matter, it is pertinent that the Court comment on the credibility of the plaintiffs. Their testimony was severely impeached and the Court finds that their testimony was seriously compromised on cross examination. A video was shown which contradicted Mr. Graves's testimony about his physical limitations. Both plaintiffs' testimony was also impeached regarding their financial losses and the standards of their life since the accident. In summary, the Court finds their testimony in many areas to be less than candid.
>
> *                    *                    *
>
> **LIABILITY**
>
> 1. At the time of the accident, the defendant was attempting to pass in a no pass zone and was exceeding the speed limit. The defendant was, therefore, negligent in the operation of his vehicle.
>
> 2. From the beginning of the no passing zone to the plaintiffs' driveway was 336 feet.

3.  Plaintiff looked into his rear view and side mirrors prior to the turn.  He did not see the approaching vehicle of the defendant.

4.  Plaintiff was aware that his vehicle had a blind spot, but did not check the blind spot prior to his turn.  If he had checked, he would have seen the defendant.

5.  The Court finds that plaintiff did turn his vehicle's turn signal on to indicate a turn, but that the signal was given just prior to the collision.

6.  Plaintiff failed to see the defendant's vehicle before the turn, and the Court finds that in the exercise of reasonable care, he should have seen the vehicle.  Therefore, the plaintiff was negligent.

7.  The Court finds both parties to be at fault.  The Court finds the defendant's fault to be 60% of the total fault, and the plaintiff's fault to be 40%.

## DAMAGES

1.  The Court finds that the surgery eventually performed on the plaintiff by Dr. Segal was essentially the same surgery previously scheduled for November 28.

2.  Because of the accident, plaintiff sustained additional expenses that he would not have [incurred] but for the accident, including medical and hospital bills, storage, ambulance, and towing bills.

3.  The accident resulted in the plaintiff suffering a spinal cord injury which was not present prior to the accident.

4.  The plaintiff suffered property loss damage to their Dodge Ram truck.

5.  Plaintiff suffered no loss of earning capacity.

6.  Plaintiff, Mrs. Graves, did miss 19 days of work as a result of the accident.

7. The Court finds that the plaintiffs suffered no loss of their standard of living or the enjoyment of life. This finding is based on their credibility and the proof in this matter.

8. Any permanent injury suffered by the plaintiff is minimal.

The Graves appeal from the Order of the trial court and raise six (6) issues for review as stated in their brief:

1. The Trial Court erred in apportioning 40% fault to the Plaintiff in this motor vehicle accident.

2. The Trial Court's finding that Mr. Graves had suffered no diminution in earning capacity was against the clear weight of the evidence and contradicted the Trial Court's own findings of fact.

3. The Trial Court's finding that any permanent injury suffered by Mr. Graves "is minimal" was against the clear weight of the evidence.

4. The Trial Court's award of $30,000 to Mr. Graves did not give him the "reasonable compensation" to which he was entitled for his lost income, pain and suffering, medical expenses, loss of consortium, permanent injury and loss of earning capacity. Further, the Trial Court failed to award Mrs. Graves damages for which there was uncontroverted proof, including her medical bills, her lost wages and her loss of consortium.

5. The Trial Court erroneously based its Judgment partly on its finding that the Plaintiffs' "standard of living" had not been reduced.

6. The Trial Court's Finding that Mr. Graves' testimony had been "impeached" is contradicted by concrete, physical evidence in the Record.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d). We further note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v.*

-5-

*Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## Allocation of Fault

    The Graves first assert that the trial court erred in allocating forty percent (40%) of the fault in this case to Mr. Graves. Although appellate courts generally give the trier of fact "considerable latitude in allocating percentages of fault to negligent parties," where the evidence preponderates against the trial court's findings, we may modify the allocation of fault. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995).[3] In reviewing the allocation of fault, we review issues of fact *de novo* on the record of the trial court. *See id.*

    In this case, we hold that the trial court did err in allocating Mr. Graves forty percent (40%) of the fault and allocating Mr. Jeter sixty percent (60%) of the fault. Our review of Mr. Graves' actions reveals that his only negligent act was failing to check his blind spot before proceeding with his turn. Although his negligence was a contributing cause of the accident, it was relatively minor when viewed in light of Mr. Jeter's actions. It is uncontested in the record that Mr. Jeter was traveling at an excessive rate of speed and that he was attempting to pass Mr. Graves in a no passing zone. Because the record clearly shows that the majority of the fault for this accident lay with Mr. Jeter, we accordingly modify the judgment of the trial court and assign ninety percent (90%) of the fault to Mr. Jeremy Jeter and ten percent (10%) of the fault to Mr. Graves. We now turn to the Appellants' remaining issues, which involve the trial court's award of damages.

## Damages

### Earning Capacity

    In an action for personal injury in Tennessee, a plaintiff may recover damages for loss of earning capacity. *See Marress v. Carolina Direct Furniture, Inc.*, 785 S.W.2d 121, 123 (Tenn. Ct. App.1989); *Southern Coach Lines, Inc. v. Wilson*, 214 S.W.2d 55, 56 (Tenn. Ct. App.1948). Damages for lost earning capacity are measured not by the amount of the plaintiff's lost wages but by the extent of impairment to the plaintiff's ability to earn a living. *See Terminex Int'l Co. Ltd. Partnership v. Tennessee Ins. Guar. Ass'n*, 845 S.W.2d 772, 777 (Tenn. Ct. App.1992); *Dingus v. Cain*, 406 S.W.2d 169, 171 (Tenn. Ct. App.1966). In determining the extent of a plaintiff's loss of earning capacity, this Court, in *Lawrence v. Brighton*, No. 02A01-9801-CV-00020, 1998 WL 749418, at *3 (Tenn. Ct. App. 1998), discussed factors to be considered, to wit:

---

[3] We point out, of course, that if this case had been tried by a jury, we would apply the more stringent "clearly erroneous" standard of review. *See also Cross v. City of Memphis*, 20 S.W.3d 642, 644-45 (Tenn. 2000).

> [I]t is proper to take into consideration plaintiff's age, and in like manner, attention may be brought to his health, character, capacity, ability to work, intelligence, skill, talents, experience, training, and industry. In addition, it is proper to consider plaintiff's habits, and other personal qualities. Other matters to be considered are plaintiff's surroundings, record of employment, and station in life, his expectancy of life, his occupation, business or profession, the effect of the injury thereon, the value of his services, avenues of occupation open to him, and the physical capacity of plaintiff to perform his work at the time he was injured and thereafter. *Marrass*, 785 S.W.2d at 123-24; *Clinchfield R.R. Co.*, 417 S.W.2d at 215; 25 C.J.S. Damages § 87(b) (1966).

The role of the trier of fact is to consider all evidence regarding these and other relevant factors, giving proper weight to each item of proof as it deems appropriate. *See Clinchfield R.R. Co.*, 417 S.W.2d 210, 215 (Tenn. Ct. App. 1966).

Prior to this accident, Mr. Graves ran a small logging business, in which he did most of the physical labor himself. He had also worked as a carpet layer for his son-in-law. Due to the degenerative problems in his neck, Mr. Graves was forced to cut back on his work in the months preceding the accident. We quote from his treating physician's deposition:

> Q [to Dr. Segal, Mr. Graves' neurologist]. And the reason why he [Mr. Graves] was in your office is because he was starting to have some problems, wasn't he?
>
> A. He was having pain in the neck and arms, yes, sir.
>
> Q. And he had already told you that the problems were so significant that they were causing him to cut back, to some degree, on his work, is that correct?
>
> A. Yes.
>
> Q. So when he was in your office the very first time prior to the accident, he already was starting to cut back work on his own.
>
> A. Yes.

In addition to Mr. Graves' ability to work being hindered by his degenerative condition prior to this accident, Dr. Segal testified that, although Mr. Graves' prognosis after surgery was good, there was no guarantee of full recovery given Mr. Graves' particular diagnosis:

Q. And at the time that you recommended the surgery, what was your prognosis for him if he had had the surgery as you had anticipated?

A. His prognosis was good. I mean there was no absolute guarantee, as I told him. There's about a one or two percent chance of causing some paralysis or difficulty with the spinal cord from the surgery itself because the surgery is moving a disk from off the spinal cord. But overall I told him there was a good chance he would get back to work with some mild limitations because he would have two disks removed, two bone grafts, and this is going to give him a little stiffness and soreness of his neck, but I would expect him to get back to work after this.

Where the issues involve expert medical testimony and all the medical proof is contained in the record by deposition, as it is in this case, then this Court may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge. With these principles in mind, we review the record to determine whether the evidence preponderates against the findings of the trial court. ***Krick v. City of Lawrenceburg***, 945 S.W.2d 709, 712 (Tenn.1997). The Appellants contend that, but for the alleged additional spinal cord injuries brought about by the accident, Mr. Graves would have made a full recovery and would have been able to resume full duties as a logger. The testimony of Dr. Segal indicates that such a result is the goal of surgery but is not absolutely guaranteed. In fact, Dr. Segal testified that, in his opinion, Mr. Graves will not be able to return to logging in the near future:

A. ...And I [Dr. Segal] feel that my statement of July of last year when I said logging was not for him [Mr. Graves] now, and that's still true.

Q. Do you think that's permanent?

A. I feel that his problems are permanent. He's made a good recovery but he's left with permanent problems that prevent him from carrying out his **main** occupation...

(Emphasis added).

Although Dr. Segal opined that logging was not within Mr. Graves' present abilities, there is nothing in this record to suggest that Mr. Graves is unable to resume some form of employment. This coupled with the fact that Mr. Graves had already been forced to cut back on his work before the accident and the testimony of Dr. Segal that there were no guarantees of recovery to the extent that Mr. Graves would have been able to resume a full work load, leads us to conclude that the evidence does not preponderate against the trial court's finding that Mr. Graves suffered no additional loss of earning capacity as a direct result of this accident.

Permanent Injury

Appellants also assert that the trial court erred in finding that Mr. Graves suffered only minimal permanent injury as a result of the accident. As noted above, Dr. Segal's testified that Mr. Graves is left with "permanent problems that prevent him from carrying on his main occupation." Prior to the accident, Dr. Segal reviewed Mr. Graves' MRIs and found degenerative changes, which Dr. Segal testified meant "wear and tear with age, wearing out". Dr. Segal further testified that he found these degenerative changes "frightening" in that they put Mr. Graves' spinal cord at great risk for injury. Another set of MRIs was taken on November 23, 2000, one day after the accident in question. Dr. Segal testified, in relevant part, as follows concerning any changes he noted between the first set of MRIs (taken before the accident) and the set of MRIs taken after the accident:

> A. ...But now in the cervical, at C-3 and C-4, at each level [the post-accident MRIs show] there is significant dorsal cord displacement, spinal cord diameter narrowing, and cord compression.
>
> Q. Is there any document that you have that indicates that [injury] was not present before the accident?
>
> A. No. This is essentially what he [Mr. Graves] had at the time when I first saw him.
>
> Q. So this is the same thing he had when you first saw him in early November of 2000; correct?
>
> A. Correct.

Dr. Segal went on to testify that, although the MRIs taken before and after the accident are the same, neurological symptoms may be evident that are not picked up on an MRI. The record does, however, indicate that Dr. Segal performed the exact surgery on Mr. Graves' cervical spine that was planned prior to the accident. In the instant case, Appellants take issue with the trial court's characterization of Mr. Graves' permanent injuries as "minimal". We note that no evidence was adduced at trial concerning the percentage of impairment suffered by Mr. Graves and no experts opined as to whether his injuries were, in fact, drastic or minimal. Consequently, we cannot say that the evidence preponderates against the trial court's finding that any permanent injuries Mr. Graves may have suffered as a direct result of this accident were minimal.

**Reasonable Compensation**

Appellants contend that the trial court failed to award "reasonable compensation" to them. Specifically, Appellants assert three points of error: (1) the trial court erred in not awarding Mr. Graves damages for lost income; (2) the trial court erred in not adequately compensating Mrs.

Graves for her alleged injuries; and (3) the trial court erred in failing to award any damages for loss of consortium.

Lost Income

As set out *supra*, the trial court awarded Mr. Graves $30,000 in damages and awarded Mrs. Graves $2,000 in damages without itemization. It is, therefore, difficult to discern exactly how much, if any, compensation Mr. Graves received for lost income. In other words, there is no evidence that part or all of the $30,000 award was not for lost income. The following relevant testimony concerning actual lost income was adduced at trial:

> Q. ...Let's talk about your [Mr. Graves'] income, first. I want to talk to you now about your area of income, sir, and what you say are your wages. Do you have present in front of you your income tax returns, sir?
>
> \*                     \*                     \*
>
> If you would, let's look first at your 1997 records. Okay.
>
> You have that in front of you, Mr. Graves?
>
> \*                     \*                     \*
>
> A. Okay.
>
> Q. Now, the '97 return, that was the year that you were also in the carpet...business; is that correct?
>
> \*                     \*                     \*
>
> A. Yes, sir.
>
> \*                     \*                     \*
>
> Q. And that year, the numbers that you were asked about by Ms. Phillips [attorney for the Graves], you were asked about the gross receipts. In other words, all of the money that that business took in before it paid out expenses; isn't that right?
>
> A. Yes.

Q. So, the gross receipts [are] not the same thing as the amount of money that you actually earned that was your spending money; true?

A. Yes, sir.

Q. Now, the gross that you testified to in '97 in the carpet business, you had gross receipts of $10,644, didn't you?

A. Yes, sir.

Q. But, you didn't tell us what the expenses were, did you?

A. No, sir.

Q. After the expenses were taken out, you made a profit of only $5,265.00; true?

A. Yes, sir.

Q. Now, I don't mean only, I am just saying that the gross receipts [are] not what you earned; true?

A. True.

Q. What you earned was $5,265.00; correct?

A. Yes, sir.

Q. Now, there was no income that year, gross income, gross receipts that year with respect to the logging business; is that true?

A. Yes, sir.

Q. That came in '98, didn't it?

A. Yes, sir.

Q. And you were, again, asked by Ms. Phillips about how much money you made in '98, didn't you, sir?

A. Yes, sir.

Q. And you testified that the carpeting business, that you said that your income was, and you testified was $9,188.00. Is that what you said?

A. Yes, sir.

Q. But that's not what you made with your expenses taken out, was it?

A. No, sir.

Q. So, your expenses, after they were taken out, left you with money that you earned, and that amount was $4,856.00; is that true?

A. I don't know. I can't find it.

Q. Well, I will tell you this, that according to your documents and records in front of you, your expenses were as follows: Car and truck expenses $3,858.00; repairs and maintenance $436.00; legal expenses of $38.00; leaving you a total expenses of $4,342.00. Have you any reason to doubt those figures? Those are from your own records.

A. No, sir.

Q. And what you actually earned was not $9,000, but actually you earned $4,856.00 isn't that right?

A. Yes, sir.

Q. Now, you also had some gross receipts from a logging business in '98, didn't you, sir?

A. Yes, sir.

Q. And that figure, that you testified earlier, when you were asked what you made, you said that you made $16,845.00; true?

A. Yes, sir.

Q. But, that's not what you actually made. And that was before you took out expenses, wasn't it?

A. Yes, sir.

Q. Actually, you had a loss that year of $8,742.00, didn't you, sir?

A. Yes, sir. I guess so.

Q. Well, this is '98. Take your time. And please look at your records to see if I am right or wrong.

A. Okay.

Q. Now, again, my question is this: You testified previously, when asked how much you earned in '98 from the logging business, you said $16,845.00; didn't you?

A. I believe I was asked what was my gross, is what I was asked. And that's what I answered.

Q. Okay. Let's talk about what you actually earned, then, okay?

A. Okay.

Q. You actually lost $8,743.00, didn't you, sir?

A. Yes, sir.

Q. And you had expenses of $25,588.00, true?

A. Yes, sir.

Q. So, there was no income that year at this point to you; correct?

A. No, sir.

Q. And you lost almost $9,000.00; didn't you?

A. I guess so.

Q. Don't guess. Is that true or not true?

A. That's what it [the tax return] says.

Q. Okay. Now, let's look at 1999. You were asked about gross receipts from 1999. You testified that there was $59,562.00; true?

-13-

A. Yes, sir.

Q. However, after the expenses were taken out, your income that year from the logging business was $2,726.00; true?

A. Yes, sir.

Q. You had expenses of costs of goods, depreciation, repairs and maintenance, and other expenses, which added up to $35,192.00; isn't that true?

A. Yes, sir.

Q. And leaving you with $2,726.00 to take home; true?

A. Yes, sir.

Q. Let's look at 2000. You testified that the gross receipts that you earned in 2000 were $74,632.00; true?

A. Yes, sir.

Q. However, the 2000 return that you have in front of you has no W-2 to support that number; does it?

A. No.

Q. Those are gone. We don't know where they are, do we?

A. No, sir.

Q. So, we can't look and see if that's, in fact, the correct amount, can we, sir?

A. No, sir.

Q. And, also, you were not asked what the expenses were. And the expenses in 2000 were $46,899.00; true?

A. Yes, sir.

Q. You made a profit the year of the accident of $1,022.00; true, sir?

A. Yes, sir.

Q. So, what we know is, that the first year you went into business, you lost $9,000.00; true?

A. True.

Q. And the second year that you were in business, you made just under $3,000.00; true?

A. Yes, sir.

Q. And the third year you were in business, you made just over $1,000.00; true?

A. Yes, sir.

Q. So, when Ms. Phillips asked you earlier, was your business increasing or decreasing, you were actually making less money than the first year that you made a profit; true?

A. Yes, sir.

From our review of the entire record, we cannot say that there is any evidence to suggest that Mr. Graves' lost income exceeded $30,000.00, or was, in actuality, close to that figure. Consequently, we cannot say that the evidence preponderates against the trial court's award of damages for lost income.

Compensation for Mrs. Graves injuries

Mrs. Graves received a total award of $2,000.00. As with the award of $30,000.00 to Mr. Graves, there is no indication in the trial court's judgment as to exactly what injuries, and in what proportion, the $2,000 is meant to compensate. What we glean from the record is that Mrs. Graves suffered no permanent injuries in the accident. In terms of the number of days of work that she missed due to the accident, at trial she testified that she had missed approximately six weeks to fifty-nine days of work to care for Mr. Graves after the accident. On cross examination, attorney for the Defendants confronted Mrs. Graves with an earlier sworn Interrogatory Response where she stated that she had missed nineteen days from work, to wit:

Q. ...[W]hen you [Mrs. Graves] signed this [Interrogatory Response], you only missed 19 days; true?

-15-

A. No. I don't think it is true because they called me up. After you take off so many days, they call you in and talk to you about the time, that you have lost from work.

So, actually, at that time, that was a hard time for not just for me, but for the Jeters also, I am sure.

But, if you want to take the 19 days, that's fine with me.

Q. What I would like to take is what's true.

A. Well, sir, when I signed that 19 days sounded fine, but I know I took six weeks off.

Q. Nineteen days sounded fine, but today, six weeks sounds better.

A. It doesn't sound any better. I wish, that I hadn't had to be off at all, sir.

*                              *                              *

Q. I am going to read to you the Interrogatories that was [sic] issued: "If Plaintiffs are making any claim for lost wages, state the amount of income alleged to have been lost and the name of the employer regarding same. Please give the days Plaintiffs claim to be off work and rate of pay for all times relevant." Did you hear what I read?

A. Yes, sir.

Q. And that's what the Interrogatories are talking about, isn't it?

A. Yes, sir.

Q. Is there anything in there that you didn't understand?

A. No, sir.

Q. And I am reading Interrogatory Number 5 from the Plaintiffs' Responses to Defendants, Hubert Jeter and Jeremy Jeter.

And now, here is my point, Mrs. Graves, according to this printout that I am looking at, there are 59 days claimed to have been missed. You agree with that? I have counted them, 59.

-16-

A. Okay.

Q. Fifty-seven of them occurred before September 11, 2001. You understand that?

A. Yes, sir.

Q. All right. So, on September 11th, 2001, according to this, you had missed 57 days. Do you understand that?

A. I understand what it says.

Q. But, yet, on September 11th when you signed this [Interrogatory Response], and you swore it was true, you swore you only missed 19 days; is that right?

A. That's what I said.

Based upon the conflict between Mrs. Graves' answers to Defendants' Interrogatories and her testimony at the hearing, we cannot say that the trial court erred in its finding that Mrs. Graves "miss[ed] 19 days of work as a result of the accident." Any conflict between the Interrogatory Response and the testimony at trial comes down to a question of Mrs. Graves' credibility. As noted *supra*, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. App. 1997).

Concerning Mrs. Graves' medical expenses, during preliminary matters, Plaintiffs' counsel stated that Mrs. Graves' medical expenses had not been attached to the Complaint, to wit:

MR. BRAGORGOS [attorney for Defendants]: ...[T]here has been no medical proof taken for Mrs. Graves. And it has not been attached. And it has never been proven. And I would ask that it not be brought up because there is no proof documenting it....

MS. PHILLIPS [attorney for Plaintiffs]: Your Honor, Mrs. Graves has, approximately, $700 worth of medical bills, which we did not, through inadvertance, attach to our complaint.

Her injuries were slight, bruising, headaches and that sort of thing....

Although the trial court did allow Mrs. Graves to testify about what happened and what injuries she suffered, no proof was offered at trial concerning her medical expenses. Mrs. Graves' testimony concerning her injuries was as follows:[134]

> Q. What happened to you in the interior of the cab of the truck at the accident? What happened to you?
>
> A. Well, I hit my head. I had severe headaches. And my neck and shoulders hurt. But as far as being seriously injured, I wasn't. I had high blood pressure after that. And I had headaches after that.
>
> Q. Had you had high blood pressure before?
>
> A. Yes, I did.

Based upon Mrs. Graves' own testimony concerning the extent of her injuries and the fact that no proof of medical expenses was offered at trial, we cannot say that the trial court failed to reasonably compensate Mrs. Graves in this regard.

Loss of Consortium

The evidence supporting the Graves' claim for loss of consortium is based upon the respective testimony of Mr. Graves and Mrs. Graves. Mrs. Graves testified that, when Mr. Graves was released from the hospital after the accident, he suffered bowel and bladder incontinence and that he had to be fed, dressed, and bathed by her for some weeks. Both of the Graves testified about the loss of their sexual relationship due to his neurological injury. The Graves also testified that they were no longer able to enjoy certain activities such as fishing and hunting and participation in a puppet ministry at church. The testimony concerning any loss of consortium comes down to whether the trial court trusted in the credibility of the witnesses. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). In addition to the credibility issues, from the trial court's judgment, we cannot determine what, if any, portion of the $30,000 and $2,000 judgments in favor of Mr. Graves and Mrs. Graves respectively, was for loss of consortium. However, be it all or none of the award, we cannot, based upon the record before us, say that evidence preponderates against the trial court's finding.

**Reduction in the Standard of Living**

The Appellants contend that the trial court erred in finding that they suffered "no loss of their standard of living." Concerning any detriment to their standard of living, Mr. Graves testified, in relevant part, as follows:

-18-

Q. And your incomes have not changed, your adjusted gross incomes ha[s] not changed, has it, sir?

A. No, sir.

Q. But, yet you told us that the standard of living that you enjoyed is gone; isn't that right?

A. Yes, sir.

Q. But, the money to pay for the standard of living which you and your wife enjoyed hasn't changed at all, has it, really, sir?

A. No, sir.

\*                                                      \*                                    \*

Q. So, to recap very quickly, when you told us that your standard of living had changed, we know now that that is not true; is that right, sir?

A. I guess.

Mrs. Graves testified, in relevant part, as follows:

Q. So when you tell us that you don't have money to do things like you used to or when your husband says you don't have money, actually your earning power has not changed at all, based on the income tax returns this Court is looking at today, is that a true statement?

A. Yes, sir.

Q. That is true?

A. Yes, sir.

Based upon the Graves' own testimony, we cannot say that the trial court erred in finding that the Graves' standard of living was not adversely altered as a result of this accident.

Based on the foregoing, we modify the findings of the trial court as to the percentage of fault to 90% for Jeremy Jeter and 10% to William Graves, thus modifying the damages allotted to William

Graves to $27,000.00 and allotted to Tressie Graves to $1,800.00. As modified, the judgment of the trial court is affirmed. Costs of the appeal are assessed to the Appellee, Jeremy S. Jeter.


_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.